IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
September 16, 2025 Session

IN RE **KAYLEE B.**

**Appeal from the Juvenile Court for Sevier County**
**No. 2023-JT-16            Keith E. Cole, II, Judge**

_____

**No. E2024-01859-COA-R3-PT**

_____

This case focuses on the termination of parental rights of Violet B. ("Mother") and Coy B. ("Father") to their Child, Kaylee B. Mother gave birth to Kaylee in June 2022, and the parents had a second child, Madison B., in December 2023.[1] The Tennessee Department of Children's Services ("DCS") sought termination of Mother's and Father's parental rights to each child in two separate petitions filed in the Sevier County Juvenile Court ("trial court").[2] The trial court conducted a joint hearing on both petitions and entered two separate orders terminating Mother's and Father's parental rights to each child. The trial court entered an order terminating Mother's and Father's parental rights to Kaylee based upon two statutory grounds. The trial court further determined by clear and convincing evidence that termination of Mother's and Father's parental rights was in Kaylee's best interest. Father has appealed. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and KRISTI M. DAVIS, J., joined.

Gregory E. Bennett, Seymour, Tennessee, for the appellant, Coy B.

Jonathan Skrmetti, Attorney General and Reporter, and Clifton Wade Barnett, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

_____

[1] Mother did not file an appeal of either order of termination; therefore, this Opinion focuses on Father's appeal only.

[2] The companion appeal involving termination of Father's parental rights to Madison B. was filed under a separate case number: No. E2024-01857-COA-R3-PT. The underlying facts are the same for each termination case, and the testimony presented at trial concerning both Children is identical. Madison B. and Kaylee B. shall be referred to collectively as "the Children" throughout this Opinion.

# OPINION

## I. Factual and Procedural Background

On September 27, 2023, DCS filed a petition in the trial court seeking to terminate Mother's and Father's parental rights to their daughter, Kaylee. On August 5, 2022, less than a month after Kaylee was born, the trial court had found probable cause that Kaylee was dependent and neglected due to "environmental concerns in the home and the parents' inability to properly take care of the child." The trial court had directed that Kaylee's paternal grandmother ("Grandmother") was to assume custody of Kaylee, with Mother and Father enjoying supervised visitation only.

Three days later, on August 8, 2022, the trial court removed Kaylee from Grandmother's custody because, according to DCS, Grandmother had violated the trial court's directive restricting the parents to supervised visitation with Kaylee. Additionally, DCS averred that Kaylee "[had been] dropped and [had] several doctor's appointments." The trial court placed Kaylee into DCS custody pending a dependency and neglect hearing that had been set for December 14, 2022. After the hearing, the trial court adjudicated Kaylee dependent and neglected and ordered that she remain in DCS custody. Upon subsequent motions filed by Father and Grandmother for unsupervised visitation, the trial court entered an order on July 6, 2023, directing that the parents should be allowed weekly "therapeutic supervised visitation" with Kaylee and that Grandmother could participate in the parents' visitation.

On September 27, 2023, DCS filed its petition to terminate Mother's and Father's parental rights to Kaylee ("the Kaylee Petition") alleging two grounds for termination against both parents: (1) mental incompetence and (2) failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the child. DCS also alleged that termination of both parents' parental rights was in Kaylee's best interest.

After Kaylee had been removed into DCS custody, Mother became pregnant with Madison, who was born in December 2023. Once DCS learned of the pregnancy from a third party, DCS filed a petition for temporary legal custody of Madison pursuant to Tennessee Code Annotated § 37-1-188, otherwise known as "Eli's Law."[3] The trial court

---

[3] "Eli's Law," codified at Tennessee Code Annotated § 37-1-188 (West July 1, 2021, to current), provides in relevant part:

> (b)    Notwithstanding this part to the contrary, there is a presumption that any child that is born to a parent, from whose custody a child has previously been removed for being dependent or neglected and the child who was previously removed is in the custody of the department

granted the petition and subsequently adjudicated Madison dependent and neglected on December 19, 2023. Madison remained in DCS custody thereafter.

On February 15, 2024, DCS filed a petition to terminate Mother's and Father's parental rights to Madison ("the Madison Petition"). In the Madison Petition, DCS alleged the ground of mental incompetence against both parents and further asserted that termination of Mother's and Father's parental rights was in Madison's best interest.

The trial court conducted a hearing regarding both petitions for termination on October 24, 2024. During the hearing, the court heard testimony from Mother; Father; Grandmother; DCS case workers, Michelle Jarrett and Amanda Wheeler; DCS Team Leader for Foster Care, Christina Carroll; Clarvida Family Preservation Services Care Coordinator, Madison Ott; and the Children's foster mother ("Foster Mother").[4] Additionally, the trial court considered the deposition testimony of psychological examiner, Sean McPherson, and geneticist, Dr. Austin Hamm. Also present at the hearing were counsel for each parent and the Children's guardian *ad litem*, Dianna Russell ("GAL").

On November 18, 2024, the trial court entered separate, nearly identical orders: one addressing the Kaylee Petition ("the Kaylee Order") and the other addressing the Madison Petition ("the Madison Order"). In the Kaylee Order, the trial court determined that clear and convincing evidence supported two grounds for termination of Mother's and Father's parental rights to Kaylee: (1) mental incompetence and (2) failure to manifest an ability and willingness to assume custody of or financial responsibility for Kaylee. The trial court also determined that termination of Mother's and Father's parental rights was in Kaylee's best interest. Father timely appealed.

## II. Issues Presented

Father presents the following issues for our review, which we have restated slightly:

___

of children's services, may be dependent or neglected and that it is in the best interest of both children that the child's birth be brought to the court's attention.

(c)    Upon learning of the birth of the subsequent child, the department shall notify the court that adjudicated the first child dependent and neglected and any other party entitled to notice of the subsequent child's birth.

(d)    Upon receiving the notice, the court should immediately schedule a hearing to inquire into the effect of the subsequent child's birth upon the case before the court and to address any further needed steps to protect the safety and well-being of the family.

[4] Clarvida was formerly named "Camelot" and was the care coordination service that DCS hired to provide "In-Home-Family Preservation Services," such as the therapeutic supervised visitations between Father and the Children.

1.      Whether the trial court erred in finding, by clear and convincing evidence, that Father was mentally incompetent to adequately provide for Kaylee's care and supervision.

2.      Whether the trial court erred in finding, by clear and convincing evidence, that Father had failed to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for Kaylee.

3.      Whether the trial court erred in finding, by clear and convincing evidence, that termination of Father's parental rights was in Kaylee's best interest.

## III.  Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006).  The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. *See* Tenn. R. App. P. 13(d); *see also In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016); *In re F.R.R., III*, 193 S.W.3d at 530.  Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).  The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002).  It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)).  As our Supreme Court has explained:

The parental rights at stake are "far more precious than any property right." *Santosky* [*v. Kramer*], 455 U.S. [745,] 758-59 [(1982)].  Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decision terminating

parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

\* \* \*

In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

## IV. Statutory Grounds for Termination of Parental Rights

Tennessee Code Annotated § 36-1-113 (West July 1, 2021, to current)[5] lists the statutory requirements for termination of parental rights, providing in relevant part:

---

[5] Unless otherwise noted, throughout this Opinion, all citations to any section within Tennessee Code Annotated §§ 36-1-113 and 36-1-102 shall be made in reference to the version that was effective on the date the Kaylee Petition was filed and not to any other version of the statute. *See, e.g.*, *In re Zakary O.*, No.

> (a)    The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.
>
> * * *
>
> (c)    Termination of parental or guardianship rights must be based upon:
>
> > (1)    A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> >
> > (2)    That termination of the parent's or guardian's rights is in the best interests of the child.

The trial court concluded that the evidence clearly and convincingly supported two statutory grounds to terminate Father's parental rights:  (1) mental incompetence and (2) failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Child.  We will address each statutory ground in turn.

### A.  Mental Incompetence to Adequately Provide for the Further Care and Supervision of the Child

Concerning this ground for termination, Tennessee Code Annotated § 36-1-113(g)(8) provides in pertinent part:

> (B)    The court may terminate the parental or guardianship rights of [a parent] if it determines on the basis of clear and convincing evidence that:
>
> > (i)    The parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or

_____

E2022-01062-COA-R3-PT, 2023 WL 5215385, at *4, n.6 (Tenn. Ct. App. Aug. 5, 2023).  In some instances, such as this one, the section that was in effect at the time the Kaylee Petition was filed has not changed and therefore remains current.

> resume the care of and responsibility for the child in the near future; and

> (ii)    That termination of parental or guardian rights is in the best interest of the child;

> (C)    In the circumstances described under subdivisions (8)(A) and (B), no willfulness in the failure of the parent or guardian to establish the parent's or guardian's ability to care for the child need be shown to establish that the parental or guardianship rights should be terminated[.]

The General Assembly's exclusion of willfulness from this statutory ground "serves to protect children from harm caused by a parent who is incapable of safely caring for them." *See In re D.A.P.*, No. E2007-02567-COA-R3-PT, 2008 WL 2687569, at *5 (Tenn. Ct. App. July 9, 2008). If willfulness were required to terminate parental rights for mental incompetence, "an obvious result . . . [would be] to condemn a child, whose parents are unfit to properly care for the child because of mental illness, to a life in serial foster homes without any possibility of a stable, permanent home." *See State Dep't of Human Servs. v. Smith*, 785 S.W.2d 336, 338 (Tenn. 1990).

Notably, this Court has rejected the argument that the ground of mental incompetence is reserved only for parents who have "a condition for which 'no amount of intervention can assist.'" *See In re S.M.R.*, No. M2008-01221-COA-R3-PT, 2008 WL 4949236, at *6 (Tenn. Ct. App. Nov. 18, 2008). We have instead affirmed the termination of parental rights when parents have suffered from unalleviated mental disorders such as bipolar disorder, adjustment disorder with anxiety and depressed mood, dependent personality disorder, and schizophrenic disorder. *See, e.g., Smith*, 785 S.W.2d at 337-39 (affirming the termination of parental rights of a parent diagnosed with schizophrenic disorder on the basis of mental incompetence although the acts of the mentally disabled parent were not willful); *In re S.M.R.*, 2008 WL 4949236, at *6 (affirming termination of parental rights on the statutory ground of mental incompetence when the parent was diagnosed with bipolar disorder and personality disorder, not otherwise specified); *Dep't of Children's Servs. v. M.R.N.*, No. M2006-01705-COA-R3-PT, 2007 WL 120038, at *10 (Tenn. Ct. App. Jan. 17, 2007) (affirming termination of parental rights on the statutory ground of mental incompetence predicated on a diagnosis of adjustment disorder with anxiety and depressed mood as well as dependent personality disorder). The parent's mental condition, however, must impair the parent to an extent that he or she cannot adequately provide for the care and supervision of the child. *See* Tenn. Code Ann. § 36-1-113(g)(8)(B)(i).

Here, the trial court stated the following findings of fact and conclusions of law relative to this ground:

The Court believes that both of these parents love their babies. It is evident to the Court, especially in regards to [Father] that he has a deep bond with those children. His emotion on the stand today was genuine and his truthfulness and candor with the Court is very much appreciated.

This case is difficult due to one thing that usually accompanies such cases. And that is intent. Neither of these parents harbor any intent and in the Court's estimation to act or omit in any form in any way that would be detrimental to these children.

The Court has carefully reviewed the deposition of Mr. McPherson. [Father] has a congenital chromosome condition, DiGeorge syndrome. After assessment, he meets criteria for moderate intellectual disability. This is considered significant and unlikely to improve. Mr. McPherson notes that adopting his experiences to future problems will be difficult. This is concerning with [Madison] and her challenges, such as the delays in gross motor skills and the therapies that she's involved with, but even more troublesome given the significant medical challenges that Kaylee is and will continue to endure. Kaylee's doctors and therapies are voluminous. The testimony indicated nine specialists. Dr. Hamm spoke of a wide array of manifestations with DiGeorge that may continue to develop on top of what he diagnosed already, such as cardiac septal defect, low muscle tone, and clearly developmental delays.

* * *

After reviewing [Mr. McPherson's] deposition, it appears that both [Father and Mother] will rely on, as McPherson says, instinct as opposed to learned experiences. Or to put it bluntly, they are not disposed to learning from their mistakes. This is a significant problem when raising any child, let alone children with significant medical issues. As such, he indicates that both may be considered only secondary caregivers. Considering the testimony that was received today, this report is not very surprising. He indicates that both Mother and Father can learn new skills, but retaining and implementing those skills over time is unlikely.

The Court has heard testimony from multiple witnesses, including Madison Ott, Christina Carroll, and Amanda Wheeler. All offer similar testimony. Both parents have been shown how to do the most menial of tasks relating to children, such as changing a diaper. However, they have not been able to be successful on a regular basis. [Father's attorney] points out that they have not been given an opportunity to show that they can. However,

this point is not very well taken. It's certainly not in the children's best interest to put the cart before the horse. The parents must be able to demonstrate that they can do simple tasks before moving on to something more significant. This is especially apparent in the testimony from Ms. Ott where she indicated that she is afraid to leave the parents when they're holding the children for fear of the children being dropped.

The Court also relies heavily on the parties' own testimony. [Father and Mother] have never been employed. Neither can drive. [Father] indicates that [Mother] can't care for the children and vice versa. . . . Even [Grandmother] indicates that neither party can care for the children. However, she then turns around and says that both parents are fit without supervision. Her testimony is very concerning to this Court. And the Court would note that it was certainly concerning to the last Judge pursuant to the Preliminary Hearing that the Court reviewed.

* * *

It is very clear to the Court that both parties have a desire to parent. Unfortunately, the Court thinks both parents lack the ability to parent.

In regards to the ground Mental Incompetence, the Court may terminate if it determines by clear and convincing evidence that the parent is incompetent to adequately provide the appropriate care and supervision of the child because the parent's mental condition is presently so impaired and so likely to remain so that it is unlikely that the parent will be able to assume or resume care and responsibility in the near future. The real issue is whether this impairment adversely affects the ability to parent. And based on the aforementioned, the Court finds that it does as to both. It is unfortunate, but the Court finds that neither party can care for themselves, let alone two children with significant health issues. As such, the Court finds that the ground of Mental Incompetence has been proven by clear and convincing evidence as to both parents.

(Paragraph numbering and bolded emphasis omitted.)

In his appellate brief, Father argues that the expert testimony presented at trial failed "to rise to any competent level of clear and convincing evidence" that Father lacked the mental capacity to care for the Children. To support this statement, Father recounts, *inter alia*, several facts gleaned from the deposition testimony of Dr. J. Austin Hamm, who had been qualified to testify as an expert in the field of genetics. However, Dr. Hamm did not examine Father and did not opine about Father's mental capacity or Father's ability to parent. Instead, Dr. Hamm examined Kaylee and testified about the symptoms, treatment,

and potential developmental problems associated with Kaylee's diagnosis of DiGeorge Syndrome. Because Dr. Hamm did not test Father or opine regarding Father's mental competence, we find that his testimony is not relevant to our consideration of this ground for termination of Father's parental rights.

Father additionally contends that the expert testimony of psychological examiner, Mr. McPherson, did not demonstrate clear and convincing evidence that Father was mentally incompetent. Unlike Dr. Hamm, Mr. McPherson did opine concerning Father's ability to parent. In 2023, Mr. McPherson had examined Father using two online "standardized assessments," including an "Executive Functioning Test." The standardized tests consisted of approximately 370 questions that Father answered on the computer. Mr. McPherson then met with Father in person to administer an additional cognitive test known as the "Reynolds Adaptive Intelligence Test." Mr. McPherson also reviewed the DCS records concerning Father's interactions with Kaylee. Mr. McPherson then prepared a fourteen-page report in which he distilled the results of the tests and interviews with Father and ultimately recommended against Father's reunification with Kaylee. Concerning Father's ability to parent Kaylee, Mr. McPherson opined as follows:

> [Father] reports a desire to resume a life with his daughter, but there are considerable concerns about his and [Mother's] ability to be appropriate primary caregivers. He has a considerable reliance on his support network for activities of daily living and his relationship with [Mother] has presented as volatile on several occasions. Due to his and [Mother's] personal support needs, and the history of instability in his relationship with his partner, it is highly unlikely [Father] will be able to meet the high intensity special needs of [Kaylee], so prognosis for successful and safe parenting based on his presenting capabilities is considered very low and reunification is not recommended. His intellectual condition is considered significant and is unlikely to improve with educational opportunities or training. Should a family member be identified who is considered an appropriate custodian, [Father] could provide secondary caregiving responsibilities under monitored guidance.

During his deposition, Mr. McPherson testified that there was not "any training that would prepare [Father]" for "all of the 'what ifs'" involved in being the "sole caregiver for a child." Mr. McPherson clarified that although Father could be "trained" to provide certain caregiving tasks in "real time," Father would not, without monitoring and assistance, be able to reliably demonstrate those abilities, "day in and day out every day." Mr. McPherson attributed Father's inability to successfully parent without supervision to Father's "mood regulation issues" and to "memory" limitations associated with his condition. Mr. McPherson reiterated that Father could be a "great secondary provider[]" for the Children but emphasized that Father would not be capable of serving as a primary caregiver "without supports."

On appeal, Father posits that Mr. McPherson's expert testimony "failed to rise to any competent level of clear and convincing evidence." In support, Father relies on two cases wherein this Court reversed the trial court's finding of mental incompetence due to insufficiency of expert testimony: *In re Quadayvon H.*, No. E2016-00445-COA-R3-PT, 2016 WL 7340427 (Tenn. Ct. App. Sept. 30, 2016), and *In re C.C.*, No. E2016-00475-COA-R3-PT, 2016 WL 5266669 (Tenn. Ct. App. Sept. 22, 2016). In *In re Quadayvon H.*, the expert in forensic psychology had "admitted that he was unable to offer testimony to a reasonable degree of medical or scientific certainty that [the father] was so mentally impaired that he would be unable to properly raise or care for the children" and therefore declined to state that the father's mental condition would render him incapable of raising a child. 2016 WL 7340427, at *2. In *In re C.C.*, the expert, a licensed clinical psychologist, had declined to state "that [the father] ha[d] no ability [to parent] because of his [impaired] cognitive functioning[.]" 2016 WL 5266669, at *13. In both cases, this Court reversed the trial court's determination that the ground of mental incompetence had been established by clear and convincing evidence in large part due to insufficiency of the expert testimony. *See In re Quadayvon H.*, 2016 WL 7340427, at *8 ("Here, we also disagree that the totality of the evidence shows [the ground of mental incompetence] clearly and convincingly. . . . []Dr. Murray . . . could not testify to a reasonable degree of medical certainty that Father's mental state would be an impediment to raising his children."); *In re C.C.*, 2016 WL 5266669, at *13 ("[W]e disagree that the totality of the evidence shows [the ground of mental incompetence] clearly and convincingly. As can be seen, Dr. Swan was ambivalent on this issue.").

*In re Quadayvon* and *In re C.C.* are distinguishable from this case. In each of those cases, the experts had declined to opine that the parent was incapable of parenting due solely to deficiencies in mental functioning. *See* 2016 WL 7340427, at *2; 2016 WL 5266669, at *13. By contrast, here, Mr. McPherson opined that there was no instruction or intervention that could prepare Father to "be able to be the sole caregiver for a child." We reiterate that according to Mr. McPherson, although Father could be "trained" to do certain caregiving tasks in "real time," Father would not, without monitoring and assistance, be able to reliably demonstrate those abilities, "day in and day out every day." Father's reliance on *In re Quadayvon* and *In re C.C.* is misplaced.

Father's reliance on *In re Jayda J.*, No. M2020-01309-COA-R3-PT, 2021 WL 3076770 (Tenn. Ct. App. July 21, 2021) is also unavailing. In that case, an expert had opined that the mother's diagnoses of "depression, anxiety, distress, and PTSD" would only result in an "inability to parent if the parent is not treating the issues with medication and counseling or is continuing to use illegal drugs[.]" *Id.* at *7. Despite this testimony, the trial court found that DCS had proven the ground of mental incompetence by clear and convincing evidence. *Id.* at *6. This Court reversed, stating that the expert proof had "established that Mother's diagnoses alone are not sufficient to show incompetence to parent without being coupled with a lack of treatment and/or drug use." *Id.* at *8.

- 11 -

Unlike the expert opinion in *In re Jayda*, Mr. McPherson opined in the case at bar that Father's mental condition would be "unlikely to improve" with treatment or medication. According to Mr. McPherson, Father had not demonstrated a capacity for learning from his mistakes when it came to raising children, and Father's inability to retain learned information had resulted in "deficiencies" in the type of "problem-solving ability" necessary to "simply protect [a] child." Mr. McPherson attributed Father's unreliability to Father's "memory" problems and "mood regulation issues" associated with his diagnosis of DiGeorge Syndrome. Mr. McPherson also testified that Father should "be considered only [a] secondary caregiver[.]" This stands in stark contrast to the expert in *In re Jayda J.*, who had indicated that the mother in that case could successfully parent given the proper medication and counseling and a discontinuation of her use of illicit drugs. *See* 2021 WL 3076770, at *7.

Moreover, the trial court considered significant testimony beyond that of Mr. McPherson to determine that Father was mentally incompetent to parent the Children. For example, the trial court credited the testimony of Ms. Carroll and Ms. Wheeler, the DCS case workers who had observed Father's and Mother's interactions with Kaylee during therapeutic supervised visits. According to the trial court, both case workers had testified that although Mother and Father "had been shown how to do the most menial of tasks relating to children, such as changing a diaper," neither parent "had been able to be successful on a regular basis." The trial court also recounted that Ms. Ott, the care coordinator for Clarvida Family Preservations Services ("Clarvida"), had expressed that she was "afraid to leave the parents when they're holding the children for fear of the children being dropped." Our review of the record reveals that the testimony of these three professionals was consistent with the trial court's findings. For the foregoing reasons, we affirm the trial court's determination by clear and convincing evidence that Father was mentally incompetent to provide for the care and supervision of Kaylee.

B. Failure to Manifest an Ability and Willingness to Assume
Legal and Physical Custody of or Financial Responsibility for the Child

The trial court found clear and convincing evidence establishing that Father had failed to manifest an ability and willingness to assume custody of or financial responsibility for Kaylee. Regarding this statutory ground, Tennessee Code Annotated § 36-1-113(g)(14) provides for termination when:

[a] parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

- 12 -

To prove this ground, DCS was required to show, by clear and convincing evidence, that (1) Father failed to manifest either an ability or willingness to assume custody of or financial responsibility for Kaylee and (2) returning Kaylee to Father's custody would pose a risk of substantial harm to her welfare. *See In re Neveah M.*, 614 S.W.3d 659, 674, 677 (Tenn. 2020); *In re Jeremiah S.*, No. W2019-00610-COA-R3-PT, 2020 WL 1951880, at *6 (Tenn. Ct. App. Apr. 23, 2020) ("Under this ground for termination, the petitioner must prove each element by clear and convincing evidence.").

As to the first prong, our Supreme Court has instructed:

> [S]ection 36-1-113(g)(14) places a conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child. If a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is satisfied.

*In re Neveah M.*, 614 S.W.3d at 677 (citing *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *13 (Tenn. Ct. App. June 20, 2018)). Concerning the "substantial harm" requirement of the second prong, this Court has observed:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *8 (Tenn. Ct. App. Apr. 4, 2018) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted in *Maya R.*)).

Here, the trial court determined that "[Father] is clearly willing, however, the evidence indicates that he is unable [to parent the Children] and placing the children in his care would place them in substantial harm." The trial court based this conclusion on the same facts upon which the court relied to determine that Father was mentally incompetent. The court additionally stated:

> The Court relies heavily on Mr. McPherson's report in regards to [Father and Mother]. The Court believes it is clear from that report that these two individuals are not able to learn from life lessons. They act on basic

- 13 -

instinct as the Court noted earlier. That's a problem when you're raising minor children. When you're raising children, every day is clearly a learning experience. And the inability to do so in and of itself places both of these children in significant harm, especially given the specific needs that each child has, Kaylee's medical needs. . . . So, once again, I believe that [Father] clearly has the intent or the willingness to do well. He simply just lacks the ability based on his intellectual disabilities to be able to provide for these children. It is clear that if the child was placed in either parent's care alone, the child would obviously be in danger of a risk of substantial harm to her physical welfare.

(Paragraph numbering omitted.)

In his appellate brief, Father delineates specific parenting tasks that he has achieved with supervision to demonstrate that he is capable of assuming physical and legal custody of Kaylee. For example, Father avers that according to the parenting assessment ordered by DCS and administered in February 2023, Father "display[ed] a moderate awareness of the basic care of an infant"; was "emotionally responsive to [Kaylee's] needs and would rock her and give her toys when she became upset"; and "appeared mindful of hygiene, removing toys from [Kaylee] when they fell on the floor." Upon review of the parenting assessment report in its entirety, however, we note that the assessing clinician also stated that "processing future events and identifying appropriate parental responses appeared moderately difficult" for Father. Specifically, the clinician reported that when presented with a hypothetical parenting scenario, Father displayed "difficulty identifying the specific details of [parenting] skills or how he would implement them." This assessment echoes the concerns raised by Mr. McPherson that Father lacked the problem-solving capability and memory retention necessary to safely care for the Children.

To counter Mr. McPherson's expert opinion and the testimony of the DCS case workers and Ms. Ott, Father points to his own testimony at trial during which he named certain specific parenting skills that he had achieved through practice and training, such as changing both Children's diapers and "know[ing] the size of the [Children's] diapers and clothing." However, Ms. Ott testified that Father had not been "successful" in his attempts to change the Children's diapers, to clothe them, or to feed them. And although the evidence at trial demonstrated that Father was sometimes capable of completing—with assistance—certain tasks related to parenting, the evidence clearly and convincingly demonstrated that Father did not possess the problem-solving skills, the memory retention, or the basic living skills necessary to successfully parent a child without constant intervention and assistance from another adult.

In addition to Mr. McPherson's report and the deposition testimony recounted above, each of the DCS workers expressed concerns about Father's ability to safely parent Kaylee on his own. Ms. Ott expressed concern that Father might inadvertently drop Kaylee

- 14 -

if left alone with her. Ms. Carroll testified that there was never a visit between Father and Kaylee during which Ms. Carroll or Ms. Ott "did not have to intervene" to assist Father with caring for her. Ms. Carroll further testified that although Father had completed Clarvida's "in-depth parenting education" at DCS's request, there remained "concerns at discharge that [Mother and Father] were not retaining the information and weren't able to utilize the information given." Ms. Wheeler, who succeeded Ms. Carroll as the family's DCS case worker, explained that after observing therapeutic supervised visitation between Father and the Children, she did not recommend "moving visits to the next level" to supervised visitation only, because both Father and Mother "still require[d] much hand over hand interaction and guidance from the therapeutic workers."

In his appellate brief, Father highlights life skills that he has learned for his own self-care. For example, Father proffers that he can "count money, identify . . . and disburse his own medication," "cook, do dishes, clean the house, bathe, tie his shoes, and dress himself." Father avers that he is "the payee on his Social Security check and he pays the electric bill and his cell phone bill, assists with additional household expenses and grocery shops." Father further states that he "currently lives with [Grandmother] in an apartment large enough to keep both children" and that Grandmother "helps with the bills." However, although Father's ability to care for himself in these ways is commendable, we are mindful that evidence of self-care is not sufficient to demonstrate that Father is capable of caring for Kaylee or any other child. The evidence supports the trial court's finding that Father does not possess the ability to assume legal and physical custody of or financial responsibility for Kaylee.

The above evidence also supports the trial court's determination that returning Kaylee to Father's custody would pose a substantial risk of harm to her. Father's inability to learn basic parenting skills, including failure to comprehend Kaylee's many and specific medical needs, poses a "real hazard or danger" to Kaylee that we find significant. *See In re Maya R.*, 2018 WL 1629930, at *8. Moreover, at the time of the termination hearing, Kaylee had resided with Foster Mother and her family for over two years. Testimony revealed that during that time, Kaylee had bonded with her foster family and developed significant relationships with her foster family's church community as well.

This Court has previously determined that removing a child who has "bonded and thrived" with her current family amounts to substantial harm. *See In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *17 (Tenn. Ct. App. July 22, 2020) (determining that the child would be at risk of substantial psychological harm if custody were restored to the father who had been apart from the child for five years and was a "virtual stranger"); *In re Antonio J.*, No. M2019-00255-COA-R3-PT, 2019 WL 6312951, at *9 (Tenn. Ct. App. Nov. 25, 2019) (concluding that placing the children in the mother's custody would put them at risk of substantial harm because the children were "very young" when they were removed and had "little to no contact" with the mother for more than a year). We determine that Kaylee would likely suffer substantial harm if removed from the

- 15 -

care of her foster family, with whom she has resided for years and had established an enduring bond. For the foregoing reasons, we conclude that the trial court did not err in determining that both prongs of this statutory ground had been established by clear and convincing evidence.

## V. Best Interest of the Child

When, as here, a parent has been deemed unfit by establishment of at least one statutory ground for termination of parental rights, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005); *see also In re Carrington H.*, 483 S.W.3d at 523 ("The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." (quoting *In re Angela E.*, 303 S.W.3d 240, (Tenn. 2010))). Tennessee Code Annotated § 36-1-113(i) provides a list of factors the trial court is to consider when determining if termination of parental rights is in a child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i)(1) (West July 1, 2021, to current) lists the following factors for consideration:

(A)    The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B)    The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C)    Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D)    Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

- 16 -

(E)     Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F)     Whether the child is fearful of living in the parent's home;

(G)     Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H)     Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I)     Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J)     Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K)     Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L)     Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M)     Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N)     Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual,

emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O)     Whether the parent has ever provided safe and stable care for the child or any other child;

(P)     Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q)     Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R)     Whether the physical environment of the parent's home is healthy and safe for the child;

(S)     Whether the parent has consistently provided more than token financial support for the child; and

(T)     Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

The statute further provides: "When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tenn. Code Ann. § 36-1-113(g)(i)(2).

As our Supreme Court has instructed regarding the best interest analysis:

These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. In re Carrington H., 483 S.W.3d at 523 (citing In re Audrey S., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." In re Kaliyah S., 455 S.W.3d [533,] 555 [(Tenn. 2015)] (citing In re Audrey S., 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." Id. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." In re Audrey S., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme"

- 18 -

evident in all of the statutory factors. Id. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. In re Audrey S., 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. White v. Moody, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. See In re Audrey S., 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. In re Carrington H., 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." In re Audrey S., 182 S.W.3d at 878 (citing White v. Moody, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

In this case, the trial court considered each of the best interest factors and determined that several of them weighed in favor of terminating Father's parental rights. The trial court accordingly concluded, by clear and convincing evidence, that termination of Father's parental rights was in Kaylee's best interest. Upon careful review, we determine that the trial court's findings regarding the best interest factors are supported by a preponderance of the evidence.

The trial court first stated that it had considered factors (D), (F), (G), (L), (N), (R), and (S) and determined these factors to be inapplicable or neutral based upon the facts of the instant case. We agree with the trial court concerning factors (D), (F), (N), (R)and (S). However, upon review of the record, we find that factors (G) and (L) weigh in favor of termination.

As to factor (G)—whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic

- 19 -

symptoms—we cannot ignore Ms. Ott's testimony concerning Kaylee's negative interactions with Grandmother, with whom Father resides. Ms. Ott testified that during many of the supervised visits, Kaylee would become "worked up" and "overstimulated" while interacting with Grandmother and that Kaylee usually did not want Grandmother "to hold her" or "to be close to her." Ms. Ott further testified that Kaylee would often scream or become "visibly uncomfortable" during interactions with Grandmother but that Kaylee's discomfort did not appear to "faze" Grandmother. For this reason, we find that factor (G) weighs in favor of termination.

Factor (L)—whether DCS has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of DCS—also weighs in favor of termination. DCS case workers oversaw years of therapeutic, supervised visitation between the parents and Kaylee, conducted home visits, partnered with Clarvida to provide Mother and Father with parenting classes and to assist them in readying their home for the care of the Children, and engaged Mr. McPherson to conduct mental evaluations for both parents and to receive recommendations from him about whether and how the parents could reunify with Kaylee. Despite these efforts, Father was not able to exhibit the parenting skills necessary to safely assume custody of Kaylee.

The trial court declined to weigh factors (E), (K), and (M) in favor of termination but did not expressly state that they weighed against termination. These factors ask, respectively, whether the parent has maintained regular visitation or contact to cultivate a positive relationship with the child; whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances; and whether the parent has demonstrated a sense of urgency in seeking custody of the child. The trial court noted that both parents had "tried to visit as much as they can" and had "done everything they could possibly do to rectify" any issues with their parenting abilities to regain custody of Kaylee. Despite their efforts at parenting, the trial court noted that "unfortunately, there are just certain limitations that [Mother and Father] cannot overcome." We agree with the trial court's reasoning as to these factors and additionally determine that the evidence preponderates against termination relative to factors (E), (K), and (M).

The trial court weighed factors (A), (B), (C), (H), (I), (J), (O), (P), (Q), and (T) in favor of termination of Father's parental rights. Concerning factor (A)—the effect termination will have on a child's critical need for stability and continuity—and factor (B)—the effect a change of caretakers and physical environment is likely to have on the child—the court found that both factors weighed in favor of termination based mostly on the testimony of Foster Mother. Kaylee had come to live with the foster family when she was "about seven weeks old" and had remained in Foster Mother's care throughout the proceedings of the instant case. Foster Mother testified at trial that Kaylee saw "eight different specialists" before she had reached one year of age and that she "was in four therapies" by the "end of her first year." Foster Mother had also taken Kaylee to a

- 20 -

geneticist and a neurologist and testified at length concerning Kaylee's specific medical conditions and needs. Foster Mother further stated that Kaylee had bonded with the foster parents' daughter, other family members, and church members. Foster Mother testified that she and her husband would adopt both Children if they became available for adoption.

By contrast to her long time residing with Foster Mother, Kaylee had not lived with Father since she was six weeks old. In his appellate brief, Father admits that he was "never offered the same opportunity to bond" with Kaylee. Furthermore, although Father demonstrated real concern and affection for Kaylee, the trial court noted that he did not appear to understand the depth of Kaylee's medical needs and appeared unable to express a plan for caring for Kaylee beyond the basics such as changing her diapers and clothes and feeding her. Our review of the record reveals that the trial court correctly weighed factors (A) and (B) in favor of termination. For the same reasons, we agree with the trial court's determination that factor (O)—whether the parent has ever provided safe and stable care for the child or any other child—weighs in favor of termination of Father's parental rights as well. The trial court noted relative to factor (O) that the termination proceedings "started with Kaylee when she was very young."

Similarly, the trial court weighed factor (C)—whether the parent has demonstrated continuity and stability in meeting the child's basic material, education, housing, and safety needs—in favor of termination. The court noted that this factor stood at the "crux of the argument" and articulated that although both parents "want to be able to provide these things" for their children, "they're unable to do so." Based on the analysis above relative to the ground of mental incompetence, we agree with the trial court and find that the evidence preponderates in favor of the trial court's determination as to factor (C).

The trial court weighed factor (H) in favor of termination, noting the "healthy attachment between [Kaylee] and her foster parents" as well as an attachment between Kaylee and her four-year-old foster sibling. For the same reasons that Foster Mother's testimony supported the trial court's findings regarding factors (A) and (B), the evidence preponderates in favor of the trial court's determination as to factor (H).

Regarding factor (I), which involves whether the child has emotionally significant relationships with persons other than the parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information concerning his or her heritage, the trial court weighed this factor in favor of termination based upon Kaylee's bond with her biological sister, Madison, and her foster parents and foster sibling. The trial court did not mention, relative to this ground, Kaylee's relationship with Grandmother, who is Father's biological mother and who had participated in many of the therapeutic visits between the parents and the Children. We are cognizant that if the foster parents adopt Kaylee, she will likely lose access to Grandmother's knowledge of Kaylee's biological family. However, the record demonstrates that since removal, Kaylee had only interacted with Grandmother during

therapeutic, supervised visits, and there was no indication that Kaylee had developed a bond with Grandmother. On the contrary, Ms. Ott testified that during supervised visits at which Grandmother was present, Kaylee would exhibit "discomfort" in being held by Grandmother and that Grandmother would often become "negative" and "upset" during the visits to the point that Grandmother would be "cussing" in front of Kaylee, and Father and others would need to "calm her down." Additionally, in an order entered on July 26, 2023, the trial court found "dependency and neglect against [Grandmother]" regarding Kaylee because Grandmother had allowed the parents to "move back in" and "have overnights" in her home with Kaylee despite a court order instructing that the parents could only "be at [Grandmother's] home from 7 am to 7 pm." Considering the record as a whole, we agree with the trial court that factor (I) weighs in favor of termination.

Concerning factor (J), whether the parent has demonstrated a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home with the parent, the trial court stated that this factor came "to the heart of the issue" and concluded that upon reviewing Mr. McPherson's reports, it was "clear that [Father was] unable to learn the skills needed to be able to take care of [his] child." Based upon our conclusion relative to the ground of mental incompetence, we agree. We also agree that factor (P)—whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive—weighs in favor of termination. The trial court stated that "over the course of two years," Father had not been able to learn "the most menial of tasks, such as feeding [and] changing diapers" to care for Kaylee. Mr. McPherson's reports, together with the testimony of DCS personnel and Ms. Ott, support this conclusion by a preponderance of the evidence.

As to factor (Q)—whether the parent has demonstrated the ability and commitment to create and maintain a home that meets the child's basic and specific needs and in which the child can thrive—the trial court found that Father had been "committed" to doing this but that he "lack[ed] the ability to maintain a home where [Kaylee's] basic and specific needs" could be met and where she could thrive. Concerning Factor (T)—whether the mental or emotional fitness of the parent would be detrimental to the child or prevent a parent from consistently and effectively providing safe and stable care and supervision of the child—the trial court stated that Father had been "unable to meet the most basic needs of the child" and was "unable to learn the skills needed to care for the child safely." Based upon the facts supporting the ground of mental incompetence, we find that the evidence preponderates in favor of the trial court's conclusions as to both factors (Q) and (T).

Accordingly, we affirm the trial court's conclusion that clear and convincing evidence demonstrated that termination of Father's parental rights was in Kaylee's best interest.

## VI.  Conclusion

For the foregoing reasons, we affirm the trial court's judgment in all respects.  This case is remanded to the trial court for enforcement of the trial court's judgment terminating Father's parental rights to Kaylee and for collection of costs below.  Costs on appeal are assessed to the appellant, Coy B.

s/Thomas R. Frierson, II

_____
THOMAS R. FRIERSON, II, JUDGE